May it please the Court, James Thompson on behalf of Uben Rush in this matter. I would like to reserve five minutes for rebuttal, if I might. I'm sorry, is it Mr. Thompson or Mr. Thomas? Thompson. Thompson. T-H-O-M-S-O-N. Okay. At first I'd like to argue the Batson case. In this matter there, Mr. Misrush was African American, is African American, and the one juror that was on the panel that was African American, Mr. Staples, was the person that was excluded by the prosecution. There are both, I think, a step two and a step three violation of the Batson rule in this case with respect to the exclusion of that witness, of that juror. The facts are that the juror was asked questions generally from the bench, excuse me, about background and other information. The prosecution did not ask any questions of the juror, nor did the defense counsel. At the time for the peremptories, the prosecutor struck Mr. Staples. Mr. Misrush's counsel objected to it, and first objected to the fact that it was the only person who was African American on the panel that was being excluded. The judge denied that basis, that you weren't entitled to a specific set of, or a number of jurors that were a minority. And then he made a standard Batson motion, and that was a non-page case. But the trial court then went on to ask the prosecutor that she should state, go ahead and state the reasons that excluded the juror. And at that point in time, step two came into play. Step two was not sufficient in this case because of the reasons that were given and the lack of particularity to the facts and circumstances of the case. The record does not reveal the age of the jurors, of any of the jurors, yet the prosecutor said that one of the reasons that they were striking Mr. Staples was because he was fairly young. But the fairly young was not tied in any way to the particular facts of the case. There were no questions asked of this juror in terms of his – Right. But the prosecutor offered other reasons, which the district court then said, confirmed that he had observed as well. There are two other reasons. The reason – the demeanor-based reasons were that at some point in time during the voir dire, Mr. Staples had frowned, and at another time during portions of the voir dire, the juror had his eyes closed. When the prosecution gave that reason, the validation of what it is that the prosecutor saw, it's not part of the step three analysis of why it was credible or not. The prosecutor failed to correct – connect its demeanor-based reasons, closed eyes and frowning, to Mr. Staples' ability to serve in the case. There must be some sort of explanation given as to why those reasons are that – Right. But if you're worried about a juror paying attention, isn't that an adequate reason? Haven't we said that that's an adequate reason? Well, but that's not the reason that was given. The reason that was given is that the juror was – had its eyes closed at times. Don't you think it's implicit in – when someone says his eyes are closed, that what he really means is his eyes are closed, he's sleeping, he's not paying attention? I mean, I've watched lots of jurors, and I can tell you when their eyes are closed, it's – you immediately – you immediately get concerned because it means they're sleeping. Your Honor, and I understand – I'm not to the extent that you have, but I've tried a number of cases as well, and when I see jurors in the well that are doing that, it causes some concern. But that's when you bring it up to the court, or that's when you ask questions about it in this situation. So your position is there wasn't adequate what? Well, there wasn't any – there wasn't any connection between the fact that the eyes were closed and that the person was not paying attention. There wasn't a statement by the prosecutor that the person wasn't paying attention. The trial court did not say that the person wasn't paying attention. The defense counsel said that doesn't mean that the person is not paying attention, and there's no following. You didn't explain the significance of his having his eyes closed. Let me ask you this. What is the – we have not always fared as well as we might in Batson cases with the case of Bowers or Supreme Court case that supports your position that simply saying that he – his eyes were closed, didn't seem to be paying attention, was – is inadequate? Well, I think the line of cases – Snyder, Miller L, both Miller L1 and Miller L2 – are cases that talk about the fact that when we get to Step 3, which is the next part, is that even if you were to find that these were facially neutral reasons, if the prosecutor made those and the court had made a determination saying, yes, I find they to be facially neutral, the court didn't comment on two of the reasons it provided. Those are Step 3, I was thinking. Well, but at first at Step 2, didn't even say that they were facially neutral, just commented that the person's eyes were closed on occasion. When you go to Step 3 – I was just wondering what – whether there was any case on the facially neutral issue when you go to Step 3, there has to be some sort of – well, Chinchilla in this case, I think Kessler to some extent in this court as well, talk about the fact that there has to be something connecting the – you know, connecting the reasons to the situation, the case itself. In Kessler, you had a number of jurors that were all taken out, all shared characteristics, and the explanation by the DA in that case was clearly race-based. I understand, but the principle that you're talking about in terms of there being facially neutral reasons, that was also discussed in Kessler. And I don't mean – it's your case, so I'm not trying to say what it isn't. But the principle of that is, and Chinchilla is the same. Yes, we understand the principle, we're just trying to match the facts a little bit to control the jury. Right. So maybe if I skip to Step 3, is that the judge then never made any credibility determination as to whether or not these reasons were in fact pretext or not. And that's what the court has to do. Why would he have to when the district judge adds that he saw the same thing? In fact, he actually adds something to the facts that the prosecutor said. He says, I noticed, he was having his eyes closed during many other aspects of the jury selection process. In fact, I noticed even as we began the voir dire process, he already has his eyes closed for a period of time. So that is the record. But that's not making the determination that Step 3 requires, which is that the judge make a credibility determination as to whether or not those facts are not just race-neutral, but that they are not a pretext. It did not provide an explicit analysis of the credibility of the prosecutor's explanation. But you did say Ms. Kim had stated a proper basis for the exercise, a factually proper basis for the exercise of peremptory challenge. It's now your burden to demonstrate that that is not true. Right. And that's Step 2. The court's analysis in that part is Step 2. You go to Step 3, the trial court must decide not only whether the reasons are race-neutral, but whether relevant to the case and whether they were genuine reasons, not just a pretext. And that's Green v. Lamarck and Lewis v. Lewis. Isn't that exactly what he did by saying, on the record, I've noticed the same thing, I've seen it with my own eyes? Isn't that a credibility determination? No. All that is is a Step 2 confirmation. So what did the court have to say that the court didn't say? The court would have to say that I've evaluated the evidence, I've looked at the reasons that you've given, and I find that they are not pretextual because... And if he doesn't use those words, then we have to reverse? Well, it's not a matter of just using... If we sent this back to this court for a further evidentiary hearing, what do you think is going to happen? That would be a waste of everybody's time. No, I think you can reverse it on the record you have in front of you. If we sent it back to the district judge and said, did you find there was a pretext, this would be a waste of everybody's time. But the court doesn't have to send it back for that determination. You want us to make the determination that it was inadequate as a matter of law and that the conviction has to be reversed. That's correct. Because it was pretextual? No, because there was not a determination by the trial court at Step 3 as to whether or not there was the additional component of there being a basis for the decision. Well, there clearly said there was a basis for the decision. Well, but the trial court said nothing in response to the frowning. The trial court, right, and in Snyder, the trial court silences to frowning. The basic principle precludes some sort of deference. No credibility determination was made by the court. The trial court sat silent on the fairly young explanation. No sensitive inquiry was made as required by Batson. Forecloses a presumption that the reason was genuine. The trial court agreed that eyes were closed on occasion. That statement merely confirms what the prosecutor saw. The statement is not a credibility finding that this court can defer to. And that's the difference between Step 2 and Step 3. What he said was true. Isn't that a credibility finding? He didn't say that what the prosecutor said was true in the sense of that's the basis for your reason, and I understand it, and I find it to be a Step 3 situation. What he said was, I agree, I saw that his eyes were closed. But the prosecutor never asked any questions of this particular juror with respect to those issues. And I ask a question with respect to the sentence. Yes. What is the best argument that the amount that was the basis for the sentencing was too high? Well, if you analyze all of the what the court did was said every Medicare claim from 1999 to 2008 is fraudulent. And then when you started to analyze, as I think we did in the brief, it started to pick out those certain portions, you would say that, say, for example, all of Triple O and Vienna, the two corporations that were owned by the husband and the father, all those transactions were fraudulent. And it's based on the testimony of one person who worked there for four to five months and another person that worked there for a year. Now, that cannot cover an entire period from 1999 to 2008. In the same way, there were other witnesses that testified about the fact that there were individual transactions made, but they only worked there for a period of time. The marketeers and doctors, as you will, did not work for Rush the entire time that she owned those companies. So you had one doctor, Dr. Glover, testify that 30% of the transactions that he did and the prescriptions that he provided were valid. They were not false. So if you take that, you've got 30% of Dr. Glover's transactions, which would have to be taken off the amount. And the amount was $8 million. So how you calculate it down, if you get it under $7 million, the amount of enhancement is significant. The CMNs were not required all the time during the 1999 to 2008 period. There were a time period from, I think, 2005 on where certain items were not, CMNs were not required. There were other periods of time where they were not required. So is your argument essentially that the evidence was insufficient, record is insufficient to support that amount? Not that those amounts were taken into account wrongfully as a matter of law. Well, they were taken wrongly because they were speculative. Because when the court decided that all of it is going to come into play without looking at the individual transactions to see exactly where it is that those amounts came from and whether you could base it. I mean, you can't, you know, the fact that no one testified that every company file was incomplete or missing documents. Yet the court found that all of the files were incomplete or missing documents. So all of it was based on speculation. So the ultimate decision to come up with the $7 or the $8 million is based on partial evidence and speculation as to the rest or inference. And to do that in this situation violates due process. There was, you know, like I say, Dr. Glover testified, but employees replaced equipment if the wrong equipment had been delivered. Ms. Rush called customers to confirm they had receipt of the equipment. So all of those things would have to be taken into account working against the amount of money that was actually determined to be fraudulent. And so to just paint a broad brush because there were fraudulent activities along the way to then say all transactions for this nine-year period were fraudulent is speculative and is an improper inference and therefore the amount of money restitution can't be considered as valid and can't give you 20-point increase in the enhancements. I mean, she had a criminal history of one. You're down to your last 15 seconds. Do you want to reserve some time? I would like to reserve whatever I may, at least 15 seconds. I will give you, I will allow you another minute for rebuttal. Thank you, Mr. Thompson. Good morning. May it please the Court, Sarah Heidel on behalf of the United States. I'll start with the that's an issue that defendant raised. The government agrees that the proper starting point in the analysis here is step two, did the government offer a race-neutral reason for the strike? And here it absolutely did. What the prosecutor actually said was, that juror has been frowning. I've watched him during jury selection. I just looked over at him. His eyes were closed. In addition, he's fairly young. And given his demeanor throughout jury selection, I believe his demeanor may be bad given his closed eyes and frowns. Now, at that point, the district court, as the panel has already noted, explicitly credited what the government had said. The court said, I will note, he was having his eyes closed during many other aspects of the jury selection process. In fact, I noticed even as we began the Vordeer process, he already had his eyes closed for a period of time. So that is the record. That was absolutely adequate to making a credibility finding as to the government's proffered reason. The district court then went on to reach step three. Having credited that reason, the race-neutral demeanor-based reason that the government had offered, he said to the defendant, now it's your burden to show that this exercise of challenge is an improper purpose. Because I find that Ms. Kim has stated a proper purpose for this exercise, a factually proper basis for the exercise of the preemptory challenge. It is now your burden to demonstrate that is not true. Whereupon, defendant made almost no effort to show that that wasn't true, offered another possible inference from the fact that the juror had his eyes closed. I can move on to the sentencing. Why don't you turn to the sentencing question? Absolutely. So as a starting point, I'd like to point out that here the government proceeded under an amount paid theory. That was the amount that Medicare actually paid on the fraudulent claims that were made. There is a rule, this court has now announced a rule under Popov that actually the government is entitled to a presumption of intended loss for any claim submitted to Medicare. So what the government's actually done here is use a very, very conservative theory of loss. We didn't use the amount billed to Medicare. We used the number actually paid to Medicare. So as a starting point, we're starting from a much lower position than we could have needed, that we necessarily need. Paid to Medicare? Actually paid by Medicare to the defendant, I apologize. So we know that, for example, that the defendant submitted fraudulent claims of $16 million. We only sought the $8 million that Medicare actually paid her. Well, I guess the question is, could they assume that they were, can they really assume that they're all fraudulent? Yes. And the evidence of that was quite strong. The evidence of the fraud in this case was overwhelming. Among other things, there was evidence at trial that this defendant brought every single Medicare beneficiary into her clinic through fraud, through a marketer. So that was, there was testimony about that at trial and there were also exhibits to that effect. And I will point the court to certain testimony. The testimony of Eric Garcia, who was the defendant's employee from 2002 or 2003 all the way to 2008. He testified to the rampant use of marketers at these DME companies. He testified that the defendant tracked the use of the marketers in something that she called the big books. And I have a site for the big books as well. That is at Volume 6, Excerpts of Record 1373 to 1378. Those are government's exhibits. They show the type of record keeping that the defendant had with respect to how she tracked her claims, how she tracked the beneficiaries. It's a spreadsheet. And among other things, there's a column called RTE. And RTE signifies the marketer that brought the claim into her DME company. There's always a marketer in that column. And among other things, it also shows how she distributed these prescriptions across the companies. She had four that she owned and operated, two others that she controlled. And she's distributing the prescriptions across those. So is it the government's theory that she had no legitimate clients? It is. And so let me address a couple other things that defense counsel mentioned. He said that there was testimony from a doctor that there were 30% of legitimate prescriptions that were written, even if that were the case. And he did say that on cross-examination. Those claims would still be fraudulent because in every instance, he also testified that he was being paid $500 by a marketer to write that prescription. And the marketer was also being paid by the defendant. So even if there were instances of actual medical necessity for some of this equipment, those claims were still fraudulent based on the use of the marketer and the use of the fraudulent payments. And the district court made a finding that the entire scheme was fraudulent? The district court made a finding based on all of the evidence that the entire scheme was fraudulent. The district court also made a finding that the defendant owned and operated the companies owned by, not owned and operated, controlled the companies that were owned by her brother and her husband. That was Vienna and Triple O. And the evidence of that was that these companies were operating at the exact same time that she was operating her fraudulent companies. The same employees worked there. The same doctors wrote prescriptions for those companies. It was just really an overlapping part of the fraud. The jury of the government at trial would just prove, she was just convicted of a very small amount of fraud, wasn't she? The government proved, I think the government proved 11 specific counts of healthcare fraud. I mean, the government's not going to go and prove 100 counts of healthcare fraud. I don't think the district court would tolerate that. But the government certainly presented evidence of widespread fraud. But in the indictment, only charged 10 instances of it. If the court has no further questions, we're done. I don't think so. Thank you, counsel. Thank you, Ms. Heidel. Mr. Thompson, I'll allow you a minute for a rebuttal. Thank you, Your Honor. With respect to Eric Garcia, noted in the reply brief on page 19, the reference, the statement to the FBI in support of the contention that Ms. Rush controlled Triple O and Vienna is a little peculiar. Garcia's statement does not reference Triple O or Vienna at all. An excerpt of record 421 through 428. So I don't think that holds water with respect to much regarding him. As to the other Triple O and Vienna, there's no records at all of her having any connection to this. There's no bank records were introduced that said that she involved in it. There's no managerial documents that she was there. Part of the evidence they used to decide that she was involved with Triple O and Vienna was the fact that she had on her wall the phone numbers of those two companies. There wasn't even any evidence that she did those phone numbers or put them there. And in fact, why wouldn't she have the phone numbers of her husband's company and her brother's company? And then lastly, with respect to Batson, which I understand the court's questions indicate a difference of opinion than mine. But the prosecution's failure to ask Mr. Staples any questions about the subjects of ostensible concern suggest in the language of Miller L, suggest that explanation is a sham and a pretext for discrimination. Prosecution did not ask Mr. Staples a single question, and there has to be more. Step three requires the trial court to do more than what it did in this case. Thank you. Thank you, Mr. Thompson. Thank both counsel for the argument. United States versus Rush is submitted.
judges: Schroeder, Bybee, Smith